# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| SMARTPHONE TECHNOLOGIES LLC, | § § § | |
| | § | NO. 6:10cv580 LED-JDL |
| vs. | § | |
| | § | PATENT CASE |
| HTC CORPORATION, et al. | § | |

## MEMORANDUM OPINION AND ORDER

This claim construction opinion construes the disputed claim terms in U.S. Patent No. 6,760,728 ("the '728 patent"). Plaintiff SmartPhone Technologies, LLC ("SmartPhone") alleges that Defendants[1] infringe the '728 patent.[2] The parties have presented their claim construction positions (Doc. Nos. 224, 236 & 241). On May 31, 2012, the Court held a claim construction hearing. For the reasons stated herein, the Court adopts the constructions set forth below.

## OVERVIEW OF THE PATENTS

The patent-in-suit is directed to "[a] method and system for importing and exporting selected directory and calendar information of a first format found in various electronic media to and from personal information management computer applications of a second format." '728

---

[1] Defendants include HTC Corporation; HTC America, Inc.; Sony Ericsson Mobile Communications AB; and Sony Ericsson Mobile Communications (USA), Inc. The Sony Ericsson entities have since been dismissed (Doc. No. 272).

[2] In addition, SmartPhone alleges infringement of U.S. Patent Nos. 7,076,275 ("the '275 patent"); 7,506,064 ("the '064 patent"); 7,533,342 ("the '342 patent"); 7,693,949 ("the '949 patent"); RE40,459 ("the '459 patent"); and 6,950,645 ("the '645 patent"), which are also asserted in Civil Action No. 6:10cv74. The Court held a claim construction hearing on March 6, 2012 specifically to address the patents common to both actions.

Further, on April 11, 2012, the Court dismissed with prejudice two of the patents-in-suit per the parties' stipulation: U.S. Patent Nos. 6,470,381 and 6,317,781. RESPONSE AT 1, n.1 (citing Doc. No. 228).

patent, ABSTRACT.  SmartPhone asserts a single independent claim in this action.  DFTS' SLIDES AT 2.  Independent Claim 22, set forth below, contains many of the terms in dispute:

> 22. A **computer system** comprising a processor, a memory unit, and a display screen wherein said memory contains instructions that when executed implement a method of importing **selected information** into a first application comprising the steps of:
>
> a) **capturing within a displayed screen of a second application a block of information** that includes said **selected information of a first format that is standardized**;
>
> b) transferring said block of information to a **support application resident on said electronic device that is an operating system tool available to a variety of applications, and capable of providing interface between said variety of applications**;
>
> c) **automatically** translating said selected information from said first format into **a second format that is native to said first application**; and
>
> d) automatically storing said translated information of said second format as a record in a database of said **first application**.

'728 patent at 13:58-14:10.

## CLAIM CONSTRUCTION PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The Court examines a patent's intrinsic evidence to define the patented invention's scope.  *Id.* at 1313-1314; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  Intrinsic evidence includes the claims, the rest of the specification and the prosecution history. *Phillips*, 415 F.3d at 1312-13; *Bell Atl. Network Servs.*, 262 F.3d at 1267.  The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention.

*Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms. *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp.v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v.Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning that it would otherwise possess, or disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For

example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). The well established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002); *see also Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 994 (Fed. Cir. 2003) ("The disclaimer . . . must be effected with 'reasonable clarity and deliberateness.'") (citations omitted)). "Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover." *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1988) (quotation omitted). "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic

evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although, "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318. Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

## DISCUSSION

I. **"capturing within a displayed screen of a second application a block of information"[3]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary.<br><br>Alternatively, "capturing, by the computer system, within a displayed screen of a second application a block of information" | "a user selecting a block of information within a displayed screen of a second application and copying it to memory" |

The parties dispute whether a user or the computer system "capture[s] . . . a block of information." *See* PLTFF'S BRIEF AT 8-9; RESPONSE AT 11. SmartPhone asserts that Defendants' proposal improperly requires user action. PLTFF'S BRIEF AT 8. Defendants contend that user

---

[3] This term is contained in Claim 22.

action is required to capture content because "capturing" is done by highlighting the desired information. RESPONSE AT 11. Highlighting selected information necessarily implicates a user because the computer system, on its own, would not know what to highlight without user instruction. *Id.* at 12.

Defendants are incorrect; capturing information does not require user action. Claim 22 is silent regarding user action and explicitly discloses that the computer system performs the capturing step:

> *A computer system* comprising a processor, a memory unit, and a display screen *wherein said memory contains instructions that when executed implement a method* of importing selected information into a first application *comprising the steps of*:
> a) *capturing within a displayed screen of a second application a block of information* . . . .

'728 patent at 13:58-64 (emphasis added). As the Federal Circuit stated in *Phillips*, "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc.*, 381 F.3d at 1115); *see also Vitronics*, 90 F.3d at 1582 ("[W]e look to the words of the claims themselves . . . to define the scope of the patented invention."). It is clear from the claim language that the capturing step is performed by the computer system and does not require user action.

Moreover, Defendants refer to portions of the specification that not only do not require any user action, but also describe the capturing step in terms of highlighting—an act that is not disclosed by independent Claim 22. *See* RESPONSE AT 11 (citing 9:64-67; 10:30-36; and 10:50-52). While these portions of the specification identify highlighting as a method of achieving the capturing step, it is merely one way of capturing a block of information. Claim 31, which depends from Claim 22, recites: "A computer system as described in claim 22 wherein said step

6

of capturing comprises the step of highlighting said block of information . . . ." '728 patent at 14:30-32. Under the doctrine of claim differentiation, the Court presumes that capture by highlighting, as described in Claim 31, does not limit Claim 22 in the same way. *See Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."). Therefore, the portions of the specification to which Defendants cite do not dictate the scope of the capturing step. Moreover, to adopt Defendants' arguments would unnecessarily narrow the means of performing the capturing step to the single method of highlighting. In addition, Claim 31, which describes the act of highlighting cited by Defendants in the specification, does not require user action. Rather, Claim 31 reiterates that capture by highlighting is performed by a computer system.

As Defendants point out, "the method is carried out by computer instructions." RESPONSE AT 12. However, Defendants fail to point to any portion of the specification that explicitly requires user action to capture information. Instead, the claim language dictates that the computer system captures a block of information. Having resolved the parties' claim scope dispute, the Court finds that no construction is necessary. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Accordingly, "capturing within a displayed screen of a second application a block of information" may be understood by its plain and ordinary meaning.

## II.   "selected information" / "selected information of a first format that is standardized"[4]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |

---

[4] This term is contained in Claim 22.

| "selected information of a first format that distinguishes the nature of the selected information" | "selected text that is formatted in a vCard or vCalendar format" |
|---|---|

As Defendants note in their briefing, the parties take issue with (1) whether "selected information" is textual information and (2) whether the "first format that is standardized" is the vCard or vCalendar format. RESPONSE AT 14. Defendants argue that Claim 22 designates "selected information" as the target of the capturing and translating steps; according to the specification, textual information is both captured and translated. *Id.* at 14-15 (citing '728 patent at 9:64-10:1; 10:17-26; 10:45-50; 10:61-11:1). In addition, Defendants maintain that the inventors consider their invention to be a "a system for importing and exporting textual vCard and vCalendar information using a clipboard application." *Id.* at 15. This intent is not only evident in the prosecution history, where the patentee distinguished the prior art by stating that it did not teach the vCard format, but also in the specification itself, where the only embodiments disclosed are the vCard and vCalendar formats. *Id.* at 16-18. Defendants further contend that the doctrine of claim differentiation does not apply because the independent claim allows for both the vCard and vCalendar formats whereas the dependent claims separately disclose the vCard and vCalendar limitations, respectively. *Id.* at 17.

SmartPhone responds, asserting that the specification discloses an embodiment where the standardized format is not a vCard or vCalendar implementation. REPLY AT 5. Therefore, restricting the first format to a vCard or vCalendar format would exclude a preferred embodiment. *Id.* In addition, SmartPhone points out that dependent Claims 23 and 24 narrow the scope of Claim 22 by adding the vCard and vCalendar limitations. *Id.* at 6. Moreover, Defendants' prosecution history disclaimer argument has no merit considering Defendants cite to the prosecution history of a continuation application in which each claim specifically required

the vCard or vCalendar format. *Id.* Finally, SmartPhone contends that limiting "selected information" to "selected text" is improper because the specification states that selected information "can be included as an attachment to message text." *Id.* at 7 (citing '728 patent at 9:39-42).

With regard to the parties' arguments concerning textual information, it is unclear what the importance of "selected information" is versus "selected text." Although Defendants cite to a number of instances in the specification where textual information or text is first captured and then translated, Defendants make no effort to explain why information should be limited to text. Moreover, Claim 22 recites capturing and translating "selected information," as opposed to "selected text." While the claims must be read in light of the specification, the specification does not limit the clear language of the claims. *See Phillips*, 415 F.3d at 1315, 1323. Therefore, "selected information" is not limited to text.

In addition, the specification seems to distinguish "text" from "information":

A translator application 720 provides the final steps to importing the selected information to a first application 725. The captured text in clipboard memory 715 *may include more text or information* than desired. As such, the translator application 720 in step 840 automatically extracts from the captured text in the clipboard memory 715 only text that is in the standardized vCard and vCalendar formats.

'728 patent at 10:58-64 (emphasis added). Thus, the specification contemplates the possibility of selecting and capturing information other than text. Accordingly, Defendants' proposition is incorrect.

Turning to the more important issue of whether the first format is standardized in a vCard or vCalendar format, the Court finds that no such limitation is present. Claims 23 and 24 narrow the scope of Claim 22, reciting:

23. A computer system as described in claim 22 wherein said first format is substantially compliant with the vCard standard format.

24. A computer system as described in claim 22 wherein said first format is substantially compliant with the vCalendar standard format.

'728 patent at 14:11-16. Under the presumption presented by the doctrine of claim differentiation, the vCard and vCalendar format limitations should not be read into independent Claim 22. *See Phillips*, 415 F.3d at 1315. Further, it seems that the only difference between the dependent claims and Claim 22 is the addition of the vCard and vCalendar limitations. Therefore, to read the vCard and vCalendar limitations into a "first format that is standardized" would render superfluous the vCard and vCalendar limitations in Claims 23 and 24, respectively. *See Digital-Vending Services Int'l, LLC v. Univ. of Phoenix Inc.*, 672 F.3d 1270, 1274-75 (Fed. Cir. 2012). Accordingly, the "first format that is standardized" is not limited to the vCard and vCalendar formats, as Defendants suggest.

As stated above, Defendants contend that the present invention is "a system for importing and exporting textual vCard and vCalendar information using a clipboard application." RESPONSE AT 15. Defendants further argue that the vCard and vCalendar embodiments are the only embodiments described within the specification. *Id.* at 18. Upon review of the specification, however, it is unclear that the inventors intended to limit the first standardized format to a vCard or vCalendar format. While the Federal Court has occasionally "supplied a definition by implication[] if the specification manifest[ed] a clear intent to limit [a] term by using it in a manner consistent with only a single meaning," this is not such a case. *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) (citing *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1303 (Fed. Cir. 2004); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001)).

The specification describes an embodiment where neither the vCard nor vCalendar formats are required:

> In one embodiment, a selected portion of the displayed multimedia information including textual information in a first format that is standardized is captured by highlighting the general area around the text. . . . [T]he translator application 720 automatically extracts from the captured text the selected information desired by keeping only text that is in the selected first standardized format and discarding the rest. The translator application 720 then automatically translates the text that is in the standardized format to a second format . . . .

'728 patent at 9:64-10:26. As Defendants note, the specification describes embodiments where the first format is a standardized vCard or vCalendar format. *See e.g.*, '728 patent at 10:46-50; 10:60-64. However, the portion of the specification cited above uses the generic "first format that is standardized" rather than specifically identifying the vCard or vCalendar formats within the described embodiment.

Moreover, even if the "first format that is standardized" referred to the vCard or vCalendar formats, the Court declines to limit the term as such. "[E]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Arlington Indus.*, 632 F.3d at 1254 (quoting *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009)); *see also Libel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2006). Defendants have not pointed to any portion of the specification indicating a clear restriction of the first standardized format to the vCard and vCalendar formats. Therefore, such restrictions will not be read into the term.

Finally, Defendants argue that the applicants disclaimed any scope broader than the standard vCard and vCalendar formats during prosecution of a child application to the '728 patent (Continuation Application 10/869,647) ("the '647 Application"). In particular,

Defendants note that Claim 36 of the '647 Application was amended to specifically disclose the vCard and vCalendar formats after a rejection in light of prior art. RESPONSE AT 16. Further, the applicant argued that the prior art did not teach the vCard format. *Id.* at 17. Thus, Defendants contend, the applicant clearly disavowed scope broader than the standardized vCard and vCalendar formats.

The Examiner rejected the '647 Application due to obviousness in light of Horie et al., U.S. Patent No. 6,486,597 and Database application. OFFICE ACTION AT 4, U.S. PATENT APPL. SER. NO. 10/869,647 (FEB. 20, 2006). The Examiner stated that:

> Horie provides a description of capturing that differs form [*sic*] the claimed invention in that Horie does not explicitly mention a 'standardized' first format. . . . It would have been obvious to one of ordinary skill in the DP art at the time of the applicant's invention to combine the teachings of the Horie and Database application because this would expand the possible applications the system could use as input improving the versatility of the DP system. . . . Horie does not show the specific application and related information formats listed in these claims. The vCard and vCalendar are standardized formats, by virtue of being standards the formats are well known in the data processing art and obvious to one of ordinary skill in the art at the time of the invention because standards become widely prevalent in the market and not addressing standards would lead to compatibility problems with other products on the market. Address books, and calendars, and email applications are also well known in the art and the related formats would be obvious because these applications are in common use and providing for them would improve the versatility of the DP system.

OFFICE ACTION AT 5 & 7, U.S. PATENT APPL. SER. NO. 10/869,647 (FEB. 20, 2006). The applicant subsequently amended Claim 36 of the '647 Application "to more specifically recite that the selected information comprises directory and calendar information substantially compatible with vCard and vCalendar formats." PRELIMINARY AMENDMENT & RESPONSE TO FINAL OFFICE ACTION AT 8, U.S. PATENT APPL. SER. NO. 10/869,647 (OCT. 10, 2006). Further, the applicant argued that the Examiner, in rejecting a claim for obviousness, must also point to the motivation for combining the prior art references without the benefit of hindsight. *Id.* at 9. It

seems the Examiner accepted the applicant's amendments and acquiesced to the applicant's arguments because the subsequent Office Action dropped the Horie obviousness rejection in favor of an anticipation rejection in light of Godfrey et al., U.S. Patent No. 6,463,463. DETAILED ACTION AT 2, U.S. PATENT APPL. SER. NO. 10/869,647 (JAN. 19, 2007). While it is true that the applicant noted that the prior art did not teach the vCard format, the comment was made in response to an Examiner comment of the same. In other words, in response to the Godfrey rejection, the applicant noted that it was the Examiner who recognized that the Godfrey art did not specifically teach the vCard format. AMENDMENT AND RESPONSE TO OFFICE ACTION AT 8, U.S. PATENT APPL. SER. NO. 10/869,647 (JAN. 30, 2007) (referencing DETAILED ACTION AT 8, U.S. PATENT APPL. SER. NO. 10/869,647 (JAN. 19, 2007). Therefore, the applicant did not necessarily amend its claims to distinguish Godfrey.

Moreover, there is no indication that the prosecution history of a child application—in this instance—narrows the scope of the parent application.[5] While the converse may be true, i.e., the prosecution of a parent application may limit the scope of the child application, *see Omega Eng'g*, 334 F.3d at 1333-34, the Court is unpersuaded that the prosecution history of the '647 Application has any bearing on the scope of the '728 patent claims. Nothing in the history above indicates that the applicant surrendered claim scope by limiting the first format to the standard vCard and vCalendar formats in the '647 Application. The vCard and vCalendar amendments not only helped overcome the obviousness rejection based on Horie, but also helped distinguish the '647 Application from the '728 patent, which does not explicitly disclose the first

---

[5] Defendants cite to *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004) for the proposition that arguments made during the prosecution of a child application may disclaim scope of the parent application. However, in *Microsoft*, the Federal Circuit concluded that disclaimers made in the prosecution history of one patent could be equally applicable to sibling patents with the same specifications. *Id.* The parent application was not at issue in the case. *Id.* at 1342.

standardized format as a vCard or vCalendar format. Examining the prosecution history, it appears the Examiner initially rejected the '647 Application for double patenting, stating that the claims of the '647 Application and the '728 patent "are not patentably distinct from each other because the claims of the current application [do not] differ significantly except that certain steps or elements being omitted in the current set of claims. . . ." OFFICE ACTION AT 2, U.S. PATENT APPL. SER. NO. 10/869,647 (JULY 15, 2005). The Examiner went on to say, "The omitting of a step or elements is obvious with the loss of function provided by that step or element. Further the claims of the current application are broader and subsume the claimed subject matter of the ['728] patent." Thus, to distinguish the '647 Application from the claims of the '728 patent, the applicant had to narrow the scope of the child application, limiting the first format to standardized vCard and vCalendar formats. Moreover, nothing in the history of the '647 Application explicitly and unambiguously forfeits scope of the earlier issued '728 patent.[6]

Having resolved the issues regarding claim scope, the Court finds that both "selected information" and "selected information of a first format that is standardized" require no construction.

### III. "support application resident on said electronic device that is an operating system tool available to a variety of applications, and capable of providing interface between said variety of applications"[7]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary. | "clipboard application" |

The parties dispute whether the "support application" should be limited to a clipboard application. *See* RESPONSE AT 18. Defendants contend the support application is no more than a

---

[6] The '728 patent was issued on July 6, 2004.

[7] This term is contained in Claim 22.

clipboard application, especially because every disclosed embodiment describes the support application as such. *Id.* at 19. Moreover, the inventors contemplated the invention as a system that imports and exports vCard and vCalendar information using a clipboard application. *Id.* at 20. In addition, Defendants argue that the prosecution history of the '647 Application shows that the applicants considered the support application to be a clipboard application. *Id.*

In contrast, SmartPhone maintains that this particular term needs no construction. The language of Claim 22 already describes what a support application is and what it does. PLTFF'S BRIEF AT 12. Moreover, the support application should not be limited to a clipboard application because dependent Claim 33 narrows the scope of Claim 22 to specifically recite that the "support application is [a] clipboard." REPLY AT 7. Thus, SmartPhone argues, Defendants' proposed construction is overly limiting.

As stated above, the claim language dictates the metes and bounds of the invention. *Phillips*, 415 F.3d at 1312 ("The claims of a patent define the invention to which the patentee is entitled the right to exclude.") (quoting *Innova/Pure Water, Inc.*, 381 F.3d at 1115). While the claims must be read in light of the specification, the disclosures within the specification do not overcome the "bedrock principle" that the claims, not the written description, define the invention. *Id.* at 1312, 1315, 1327. Thus, simply because "[e]very disclosed embodiment includes a 'support application' that is a 'clipboard application,'" as Defendants contend, the claim language does not present such a limited interpretation. Rather, Claim 22 states that the "support application" is "resident on said electronic device," "is an operating system tool available to a variety of applications, and capable of providing interface between said variety of applications." '728 patent at 13:66-14:3. Therefore, to restrict the "support application" to a

"clipboard application" would improperly import a limitation from the specification into the claims.

Moreover, the presumption present under the doctrine of claim differentiation further indicates that confining the support application to a clipboard application is erroneous. As SmartPhone points out, dependent Claim 33 recites: "A computer system as described in claim 22 wherein said support application is [a] clipboard." '728 patent at 14:39-40. Defendants have not presented persuasive argument as to why the presumption should be dispelled. Thus, the "support application" shall not be limited to a clipboard application. *See Phillips*, 415 F.3d at 1315.

Finally, Defendants' prosecution history argument has no merit. Defendants note that the applicant stated that the prior art "directly teaches away from claim 36's recitation of using the support application (clipboard) of the operating system," indicating that the clipboard is the support application referenced. *See* AMENDMENT AND REMARKS AT 12, U.S. PATENT APPL. SER. NO. 10/869,647 (AUG. 27, 2008). While the applicant may have considered the clipboard to be a type of support application, there is no clear disclaimer limiting the support application to a clipboard. Thus, the Court declines to limit the support application to a clipboard application. *See Omega Eng'g*, 334 F.3d at 1324 (stating that disclaimers must be unequivocal and unambiguous).

Moreover, the applicant's statement, when examined in context, referred to the Examiner's rejection of the '647 Application's dependent claims—Claims 46 and 47, which depend on Claim 36. In the prior Office Action, the Examiner rejected Claims 45-47, 66-68, and 70 as obvious in light of Bell et al. (U.S. Patent No. 6,600,902), Kadyk et al. (U.S. Patent No. 7,046,691) and Ramakesavan et al. (U.S. Patent No. 6,704,770). FINAL OFFICE ACTION AT 5,

U.S. PATENT APPL. SER. NO. 10/869,647 (JULY 3, 2008). Upon examination of the prosecution history, it appears that the applicant's comments regarding Claim 36 were likely targeting the Examiner's rejection of the specific recitation of the support application as a clipboard in the dependent claims. Like Claim 22 in the '728 patent, independent Claim 36[8] of the '647 Application recites "a support application," rather than a clipboard. *See* AMENDMENT AND REMARKS AT 2, U.S. PATENT APPL. SER. NO. 10/869,647 (AUG. 27, 2008). However, dependent Claims 46 and 47 discuss transferring blocks of information onto clipboard memory and state that the support application is a clipboard, respectively. *Id.* at 3. The applicant's remarks were made to distinguish the Ramakesavan prior art, where the applicant noted that "Ramakesavan's teaching is to ***not use the clipboard*** and instead to use special 'global' menu calls. This directly teaches away from claim 36's recitation of using the support application (clipboard) of the operating system." *Id.* at 12 (emphasis in original). The applicant went on to state that "[c]laims 45-47, in depending from claim 36, incorporate all of its features and so each of these claims is patentable over any proper combination of Bell, Kadyk and Ramakesavan for the reasons discussed above." *Id.* at 13. Thus, the applicant's statements are "amenable to multiple reasonable interpretations"; the applicant likely distinguished the clipboard feature in relation to those claims that depend on Claim 36, rather than stating that Claim 36 itself requires a clipboard application. Therefore, the Court declines to find that the applicant unmistakably disclaimed scope, limiting a "support application" to a clipboard application. *See Omega Eng'g*, 334 F.3d at 1324.

---

[8] The Examiner also rejected independent Claims 36 and 57 as obvious in light of Bell and Kadyk. FINAL OFFICE ACTION AT 11, U.S. PATENT APPL. SER. NO. 10/869,647 (JULY 3, 2008). However, Defendants point to comments made in regard to Ramakesavan, which was only raised in regard to the dependent claims discussing the clipboard. *See id.* at 5. Moreover, the Examiner stated that "Bell and Kadyk do not specifically [teach] support application is a clipboard." *Id.* at 8; *see also id.* at 10.

Because the language of Claim 22 describes the role of the support application, the Court finds that no construction is necessary for the term "support application resident on said electronic device that is an operating system tool available to a variety of applications, and capable of providing interface between said variety of applications."

## IV.   "first application"[9]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary.<br><br>Alternatively, "personal information management application" | "a personal information management application such as an electronic address book or electronic calendar that does not read information in the first format" |

SmartPhone believes that "first application" needs no construction because the term is understandable in the context of the claim. PLTFF'S BRIEF AT 7. However, if the term requires construction, SmartPhone proposes that the term should be defined as a "personal information management application." *Id.* In contrast, Defendants insist that "first application" requires clarification, specifically highlighting that the first application cannot read information in the first format. RESPONSE AT 9. In addition, Defendants attempt to give examples of types of first applications, such as electronic address books or electronic calendars, which Defendants contend, is in accordance with the embodiments described in the specification. *See id.*

Defendants' arguments are unpersuasive. First, electronic address books and electronic calendars are improper exemplars of "first applications" in light of the Court's finding that the '728 patent is not limited to the vCalendar and vCard formats. *See infra* Section II. Second, Defendants' concern over confusing claim language is unfounded. The claim language lays out that the "second format . . . is native to said first application," '728 patent at 14:4-6, and the

---

[9] This term is contained in Claims 22 and 25.

"second application . . . includes . . . information of a first format." *Id.* at 13:63-65. Moreover, Defendants proffer no support to the contrary. Finally, the Court declines to construe "first application" as a "personal information management application." While the parties seem to agree on this point, the parties have offered no support in the claim language for such a construction.

Consequently, the Court finds that the jury will understand the plain and ordinary meaning of the term "first application." Therefore, no construction is necessary.

**V.** **"a second format that is native to said first application"[10]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary. | "a format that the first application normally writes and reads and that is different from the first format" |

SmartPhone argues that the term "a second format that is native to said first application" is readily understood and requires no construction. PLTFF'S BRIEF AT 14. Defendants, on the other hand, contend the term should be construed, at least, to explain that "the second format that is native to the first application is (1) the format the first application normally writes and reads and (2) a different format from the first format." RESPONSE AT 23-24.

The phrase "a second format," when read in conjunction with the remainder of Claim 22, plainly indicates that the "second format" is different from the "first format." Therefore, to address the claim scope dispute among the parties, the Court need only address the term "format that is native."

As an initial matter, "native" is a term of art that the trier of fact would likely not understand without guidance. Defendants provide a definition of "native," stating that a native

---

[10] This term is contained in Claim 22.

format is "one that an application normally read and writes." *Id.* at 24. While this definition is instructive, it does not wholly encompass the idea that a format is tied to a particular application, as the context of Claim 22 indicates. Claim 22 specifically designates (1) "a first format that is standardized"; (2) "automatically translating said selected information from said first format into a second format that is native to said first application"; and (3) "automatically storing said translated information of said second format as a record in a database of said first application." '728 patent at 13:65-14:10. First, translating and storing implies the act of reading and writing, respectively. Second, the language of the claims is very broad, implying that several native formats could exist, e.g., a first format and a second format. Further, at the hearing, Defendants proposed that a "native format" is "a format in which the application was specifically designed to read and write." MARKMAN TRANSCRIPT AT 85:16-22 (Doc. No. 249). Defendants' proposed language more aptly ties the specific format to the specific application; in other words, the definition alludes to the particular relationship between the second format and the first application, etc. Accordingly, the Court defines "format that is native" as "a format in which the application is specifically designed to read and write."

## VI.   "automatically"[11]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary. | "without user discretion or intervention" |

SmartPhone maintains that "automatically" may be understood according to its plain and ordinary meaning. PLTFF'S BRIEF AT 13. Defendants, however, propose that the "automatic" steps disclosed in Claim 22 are an important feature of the patented technology. RESPONSE AT 21. In fact, the Examiner stated that the prior art did not "detail or suggest" the "automatically

---

[11] This term is contained in Claim 22.

storing" step.  *Id.*  Moreover, various technical dictionaries essentially define "automatically" as "without user intervention."  *Id.* at 23 (citing IEEE STANDARD DICTIONARY OF ELECTRONIC AND ELECTRICAL TERMS 58 (6TH ED. 1996), EX. 10, ATTACHED TO RESPONSE, AND GEORGE MCDANIEL, IBM DICTIONARY OF COMPUTING 42 (10TH E. 1994), EX. 11, ATTACHED TO RESPONSE).  Finally, Defendants maintain that "automatically" should be construed to distinguish the translating and storing steps (steps c and d of Claim 22), which are automatically performed, from the capturing and transferring steps of Claim 22 (steps a and b), which Defendants contend require user interaction.  *Id.* at 21.

A review of the transcript shows that the parties agree that the computer "automatically" translates and stores information.  MARKMAN TRANSCRIPT AT 6:13-15; 16:19-23.  However, it became apparent at the hearing that the real issue was whether the translating and storing steps could potentially involve some type of user interaction, despite being automatically performed.  *See id.* at 17:11-18:22.

At the hearing, SmartPhone agreed to a construction of "automatically" that stated "without user interaction" so long as the possibility for some user input was left open.  More specifically, the computer system of Claim 22 translates and stores "without user interaction," but some kind of user input could be involved concerning, for example, the exact content stored or confirmation from the user to store or translate.  MARKMAN TRANSCRIPT AT 26:18-28:6; 47:2-7.  Defendants appeared to agree to such a construction.  *Id.* at 28:22-29:7.

Accordingly, the Court construes "automatically" to mean "without user intervention." However, such a construction is specifically limited to what is expressly disclosed in steps c and d of Claim 22.  In other words, the translating and storing steps are performed "without user

intervention," but such a construction is not exclusive of any user interaction related to the performance of such steps.

## VII. "computer system"[12] / "said electronic device"[13]

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| computer system | "electronic device" | No construction necessary |
| said electronic device | Plain and ordinary meaning, no construction necessary. | Indefinite |

Defendants contend that a "computer system" cannot be an "electronic device" because different claim terms are presumed to have different meanings. RESPONSE AT 5-7. Moreover, multiple electronic devices and computer systems are disclosed with respect to Figure 1B. Therefore, simply reading a computer system as an electronic device does not specify which electronic device is claimed by the language in Claim 22. *See id.* at 5-6. Finally, construing "computer system" as an "electronic device" makes the scope of Claim 22 redundant to Claim 1. *Id.* at 7. Defendants contend that the only significant difference between the claims is the term "computer system"—disclosed in Claim 22—as opposed to "electronic device," which is disclosed in Claim 1. Therefore, these terms must have different meanings. *Id.* at 8.

The specification seems to use "electronic device" and "computer system" interchangeably. The following excerpts from the specification use "computer system" and "electronic device" to represent the same concept:

- "The PDA 100 is also known as a palmtop or palm-sized electronic system or computer system. The PDA 100 has the ability to transmit and receive data and information over a wireless communication interface (e.g., a radio interface). The PDA 100 is on exemplary implementation on which the present invention can operate. The present invention can operate on any portable electronic system or device." '728 patent at 5:32-39.

---

[12] This term is contained in Claims 22, 25 and 30.

[13] This term is contained in Claims 22 and 30.

- "Cradle 60 provides an electrical and mechanical communication interface between bus 54 . . . and the computer system 100 for two way communications. Computer system 100 also contains a wireless infrared communication mechanism 64 (e.g., an infrared emitter and detector device) for sending and receiving information from other similarly equipped devices." *Id.* at 6:11-17.

- "[T]he exemplary personal digital assistant or palmtop computer system 100 can be used in a network environment combining element of networks 50 and 51. That is, as will be seen below, the PDA 100 can include both a wireless infrared communication mechanism and a signal (e.g., radio) receiver/transmitter device." *Id.* at 6:20-25.

- "Electronic device 100, such as a personal digital assistant (PDA) . . . ." *Id.* at 9:57-58; *see also id.* at 11:24-25; 11:41-42 (equating PDA 100 to an electronic device).

These excerpts from the specification illustrate that "PDA 100" is both a computer system and an electronic device. Thus, in the specification an "electronic device" is also described as a "computer system." *See Bancorp Services, LLC v. Hartford Life Ins. Co.*, 359 F.3d 1357, 1373 (Fed. Cir. 2004) ("[I]t is not unknown for different words to be used to express similar concepts, even though it may be poor drafting practice.").

Further, the specification discloses that "Electronic device 100, such as a personal digital assistant (PDA)" may satisfy the requirements of Claim 22. In describing Figure 7, the specification states:

> ***Electronic device 100, such as a personal digital assistant (PDA) in accordance with embodiments of the present invention, displays multimedia information such as video and text from a second application 705***. . . . In one embodiment, a selected portion of the displayed multimedia information including textual information in a first format that is standardized is captured by highlighting the general area around the text. ***The captured text 710 is transferred to the memory of a support application that is capable of interfacing and operating between various programs and applications on a single electronic device such as a computer system.*** This support application has the general ability to copy text in a highlighted form of one computer application into memory, and then transfer the same to another computer application. One such application is the clipboard application that is found in the operating systems of many commercially available

desktop computer systems. The clipboard application allows for the cutting or copying of highlighted textual information displayed from one application to a clipboard memory 715 and then ***subsequently pasting that information to the same or another application resident on electronic device 100***.

'728 patent at 9:57-10:16 (emphasis added). The functions described in the excerpt above mirror the limitations of Claim 22, which recites a computer system. In particular, both the excerpt above and Claim 22 disclose "implement[ing] a method of importing selected information into a first application," capturing information of a first format, and then transferring the information to "a support application resident on said electronic device that is an operating system tool available to a variety of applications, and capable of providing interface between said variety of applications." *Id.* at 13:58-14:3. Thus, to conclude that an electronic device serves the same functions as a computer system is not an unreasonable reading of the specification or the claim language.

Defendants' arguments regarding Figure 1B (below) are not persuasive. Defendants contend that because Figure 1B discloses an embodiment where the claimed system encompasses multiple computer systems, an "electronic device" could refer to any number of the computer systems in the figure, i.e., laptop computer 58, IBM compatible computer system 56, or handheld computer 100; in other words, if a computer system were defined as an electronic device, it is unclear which of the multiple



computer system were defined as an electronic device, it is unclear which of the multiple

computer systems of Figure 1B would contain instructions to execute the method of importing information, as recited in Claim 22. This, however, is a faulty reading of the specification. The "computer system" and "electronic device" of Claim 22 are limited by the metes and bounds outlined by the claim language. Particularly, the preamble states that the "computer system" comprises "a processor, a memory unit, and a display screen wherein said memory contains instructions that when executed implement a method of importing selected information into a first application." *Id.* at 13:57-61.

While the portion of the specification concerning Figure 1B does not delve into the functions of the components depicted in Figure 1B, the portion of the specification referring to Figure 5 may shed light on the matter. The '728 patent states, with reference to Figure 5, that "portions of the present electronic system are comprised of computer-readable and computer-executable instructions which reside, for example, in computer-readable media of an electronic system (e.g., personal digital assistant, computer system, and the like)." '728 patent at 7:29-33. In particular, the specification notes that "an exemplary electronic system or computer system 100 (such as the personal digital assistant)" includes:

> volatile memory 102 (e.g., random access memory (RAM), static RAM, dynamic RAM, etc.) coupled with the bus 99 for storing information and instructions for the central processor 101 and a non-volatile memory 103 (e.g., read only memory (ROM), programmable ROM, flash memory, EPROM, EEPROM, etc.) coupled to the bus 99 for storing static information and instructions for the processor 101. Exemplary computer system 100 also includes an optional data storage device 104 (e.g., memory card, hard drive, etc.) coupled with the bus 99 for storing information and instructions.

*Id.* at 7:42-59.  Figure 5 (below) shows that computer system 100 comprises a processor, a display device, and a memory unit that contains instructions in accordance with Claim 22.



Note that the specification uses PDA 100, computer system 100, and electronic device 100 to represent the same concepts.  *See supra* pp. 5-6.  Moreover, it appears that computer system 100 of Figure 5 is handheld computer 100 from Figure 1B.  The specification refers to a single computer system, specifically computer system 100, that contains "a processor, a memory unit, and a display screen wherein said memory contains instructions that when executed implement a method of importing selected information into a first application."  Thus, laptop computer 58 and IBM compatible computer system 56 cannot meet the limitations set forth in Claim 22.  Accordingly, there is no confusion in defining a computer system as an electronic device, despite Defendants' concerns.

Finally, Defendants contend that construing "computer system" as an "electronic device" renders Claim 22 redundant to Claim 1.  The Court disagrees.  The context of the preamble in Claim 22 provides additional limitations that narrows the scope of Claim 22.  As stated above, Claim 22 requires "[a] computer system comprising a processor, a memory unit, and a display screen wherein said memory contains instructions that when executed implement a method of

importing selected information into a first application." '728 patent at 13:58-61.  Claim 1 recites

no such limitations, thereby distinguishing Claim 22 from Claim 1.  Thus, Defendants' argument

fails.

Accordingly, the Court construes "computer system" as "electronic device."  In light of

this construction, the Court finds that "said electronic device" may be understood by its plain and

ordinary meaning, and therefore no construction is necessary.[14]

## VIII.   Order of the Steps/Elements

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No imposition of order necessary | Steps a), b), c), d) must be performed in the order a), b), c), d). |

Defendants propose that the method steps recited in Claim 22 should be performed in the

order recited because logic dictates as such.  RESPONSE AT 24-25.  For example, a "block of

information" cannot be "transferr[ed]" (step b) until such information is "captured" (step a).  *Id.*

at 25.  Defendants further point to Figures 7 and 8 for support, which depict flow charts showing

that the sequence of importation steps occurs in the order recited, i.e., step a, b, c, then d.  *Id.* at

26-27.  SmartPhone asserts that the steps need not be performed in the order recited, especially

given that there is no disclaimer dictating the order of steps in the specification.  *See* PLTFF'S

BRIEF AT 13.

It is important to note that Claim 22 is not a method claim, but rather a system claim, the

bounds of which are defined, in part, by a method the system is capable of performing.

Moreover, the claim language does not dictate that the steps be performed in any particular

order.  *See Altiris v. Symantec Corp.*, 318 F.3d 163, 1369 (Fed. Cir. 2003) (citing *Interactive Gift*

---

[14] In addition, the Court finds the term definite.  *See* REPORT AND RECOMMENDATION addressing invalidity for
indefiniteness.

*Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342-43 (Fed. Cir. 2001)) (stating method steps that do not actually recite an order do not usually require one).  For example, the claim language does not disavow the possibility that certain steps can be performed concurrently.  In other words, the system could capture a large block of information and translate the information in stages, i.e., store a portion of translated data while the system simultaneously translates the remaining portion of data.

Consequently, the Court finds that the steps disclosed in Claim 22 are not required to be executed in the order they are written, i.e., a, b, c, then d.

## CONCLUSION

For the foregoing reasons, the Court adopts the constructions set forth above.

**So ORDERED and SIGNED this 18th day of March, 2013.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE